Good morning, and may it please the Court, my name is Lincoln Bandlow, and I represent the Appellant Machete Productions, L.L.C. Don't mess with Texas is a nice sentiment and a catchy bumper sticker, but it can't be the basis for a state withholding funds under the First Amendment, and that's really what we're here about. But I don't think we really need to get to that necessarily right away, because it is a, of course, an axiomatic that if you can avoid the big constitutional issues, you should do so and go with the more narrow procedural issues, and I think there's a significant one here, which is the failure of the district court to allow leave to amend under circumstances in which I think it was an abuse of discretion not to do so. What are the facts you think you could discover that would make a difference? That we could additionally allege, there's a number of things we could additionally allege or discover through discovery. We could allege the intent to do additional machete films. We could flesh out, the district court seemed to be concerned about the fact that the initial entity that made the original machete film was Machete Chop Shop, Inc., and then there was a new entity, Machete Productions, L.L.C., that made the sequel. There's reasons for that. That can be fleshed out. I was involved in making both of those films, so I know why we had to change the entity there, and we could flesh that out. That only was an issue for the district court because it affected this ability to get perspective relief because they thought, well, maybe it's going to be another entity. On the merits of the First Amendment claim, it's clear what this program does, what the regulations are, and what more is there to add to whether the program violates the First Amendment? Well, how it's being applied and how these decisions are being made, and if you look at the Finley case, which is the seminal case that's at point here on this case, Finley was a summary judgment motion, so we had a full development of the facts. We had a full exploration into how or why the provisions were being used. In fact, the court talked about how they weren't in practice being used in a viewpoint discriminatory way. So here, we have very specific allegations that Mr. Morales essentially told us, I don't care what your film has, you're not going to get funding from us because of the political content of it. The Supreme Court didn't say that. Well, that's what we've alleged. We've alleged that he held a meeting with our producers and said that because of the political content and the controversy around the film. I believe so. I believe that's what we've alleged. Even assuming he said that, I mean, a few months ago, the Supreme Court said it was okay for Texas not to have the license plate, Sons of Confederate Veterans, with the Confederate flag. That's clearly viewpoint discrimination or political discrimination against people who are sympathetic to the Confederacy. And the Supreme Court said because it's government speech, I mean, that was the issue as a license plate, you know, citizen and government speech, but it fell in the government speech box. And they said the government can say we don't want anything to do with the Confederacy. So why can't they say we don't want anything to do with this anti-Texan machete movie? Well, because that's where the government is the speaker. And that's the distinguishing factor there. When the government acts as the speaker itself, the government can choose what speech it wants to speak or not speak. And there's various cases that say that, but this is government as patron. This is government as providing funding for other people to be the speakers. And in that circumstance, as the court pointed out in Finley and in other cases, you have a different layer of analysis. So because it was the government in the Texas situation with license plates that puts out the license plates, that's in charge of the license plates, they are the speaker. Here, the government really isn't the speaker. The filmmakers are the speakers. And if the government's going to get into the game of funding filmmakers, it can't get into the game of telling, of discriminating based on viewpoint what those filmmakers do. But I mean, in the license plate case, they were allowing University of Michigan type of license plate, University of Illinois, I mean, Texas was allowing that. And obviously the state of Texas isn't trying to promote these out-of-state schools. So it wasn't quite as simple as, well, you have to have a license plate that says Texas on it. They were allowing kind of everybody and their brother, except these sons of Confederate veterans. Well, because again, because they were the speaker. It's the same with abortion funding cases, et cetera, where the government is the person deciding what speech that they like or don't like in terms of the speech that they're putting out themselves. And so they can discriminate between what license plates have whatever message they think is important to their program or not. I want to acknowledge, I suppose you do, that the state administering this movie program can make certain decisions that don't allow everybody into the state of Texas to make a film, even though they may satisfy the employment requirements of the statute. Certainly. So where are you drawing the line and specifically why are you claiming that they unconstitutionally discriminated against you as opposed to making any other kind of discretionary decision? Well, and that's what the court said in Finley. I'm asking you. Yeah. Tell me why. The difference here is because the statute specifically sets out particular kinds of speech that has a particular viewpoint. The statute says that content that portrays Texas or Texans in a negative fashion. So it favors only positive portrayals of Texas or Texans and disfavors negative portrayals. You're saying that I have a constitutional claim because I portrayed Texas in a negative view. Is that what you're saying? I'm saying that. Add to that. Go ahead. Yeah. Texas' ability to withhold funds based on its disapproving of messages that are negative of Texas gives a First Amendment claim, yes. And it's exactly. Once they went into the film business, they had no basis of any kind to say that we will not fund a film that produces a negative view of Texas. However negative that may have been, they had no authority to do that, constitutional authority. Under the First Amendment, they cannot withhold funding based on that particular viewpoint discrimination. And that's exactly what Finley said. Finley had a very broad standards of decency type requirement and the court, the majority there said that that was fine because it wouldn't lead to any particular viewpoint discrimination. But it said if the provision had language that would lead to viewpoint discrimination, we'd have a different case. They said it multiple times. They said. You're claiming that the statute itself is unconstitutional. That is the statute that authorizes the director of the films to deny funds to any film that produces Texas in a negative way. That provision on its face, we are alleging is unconstitutional. Unconstitutional. Yes, that provision. Yes. And we haven't challenged the other provision. The Texas statute has similar language as in Finley that you can consider general standards of decency, etc. We're not challenging that. Is that really an as-applied constitutional challenge? You're seeking to strike the whole statute. Well, we're not seeking to strike the whole statute. We're seeking. Well, not the whole statute, but that provision. Yes. So we are making a facial challenge and an as-applied challenge as well. And certainly we think the as-applied challenge is another reason why allowing additional discovery or allowing the case to proceed further. Tell me about the as-applied challenge. I'm sorry, what? Tell me about the as-applied challenge, how you fit into it even if it's facially constitutional. We believe that the use of that language to deny funding to the initial film and the sequel was based on a particular discrimination against the film having a viewpoint about immigration in Texas, the film having some viewpoints about crime, etc., in Texas. And so the statute was used in this circumstance to discriminate against that particular speech that relayed that message. But the film got made. Texas didn't keep you out of Texas. It didn't keep you from getting licenses. It didn't keep you from making the film. No, the film did get made. It just didn't want to pay you to make Texas look bad. And your position here is that Texas has to pay to make it look bad. You know, they can get that for free. They don't have to pay for it. Well, I think one of our positions is that even the whole purpose of the statute, which is to increase, the main purpose of the statute on question is to increase filming in Texas, which Robert Rodriguez and Machete does quite a bit of in Austin, is to increase employment in Texas. And certainly there's an interest in enhancing tourism to Texas. But disallowing films that are somehow negative or portray Texas or Texans in a negative fashion, I don't think you can make any connection that that would have any effect on any of those interests of the statute. I mean, you can, as I said in my briefs, you can think of the movie JFK. That certainly presents a Texan in a negative fashion. But that would make everybody want to go to Dela Plaza. One hospital was diagnosed with Ebola in Dallas, and all of a sudden people didn't want their kids competing in a softball game 30 miles away. Okay, so yeah, negative portrayals of an area can have an impact on it. People become afraid of an area. So what if you said you had a film about that and made people think Ebola's, you know, rampant in Dallas? I promise you that will keep people out of Dallas. So why should Texas have to pay for that? That's exactly right in the sense that some kind of factual portrayal that might lead people to not want to come to Texas for fear of catching Ebola or what have you, that's exactly what the reason why the commissioner changed the standard himself. Because he said this negative of Texas standard was too vague and incomprehensible. And what he imposed was an actual standard which was, it had to be factually inaccurate about Texas. Addressing some of the concerns you're talking about here. And so that was how the statute was being applied. If it was a false fact, it, they, they, they, Well, I'm not talking about a false fact, it's, you know, you make a fictional movie, I mean, there's all kinds of fictional movies set in real places, you know, kind of almost historical fiction. So you have like the real life Abraham Lincoln, but then you have a made up character. So you can say this is a work of fiction, any relevance to real events is coincidental. And then do a whole Ebola crisis in Dallas movie and I can promise you it's going to scare people. But you could also, you could also do a film that would be negative of, of Governor Perry or negative of, of Texas officials and that would fall under the standard too. I'm taking this question as posed to me by Judge Haynes. Is that unconstitutional? If you wanted to make a film about Texas, Dallas being the center of Ebola in the United States, are you saying that the, the state of Texas did not funds for that film would be unconstitutional? I think so. I think what we're saying is once you just talked yourself out of court, well, what, what I'm saying is once you get in the business of, of deciding to fund films, you can't then get in the business of discriminating against speech because you feel, uh, uh, it's speech that you think would, it would cause some upset or concern. That's the kind of speech that exactly needs First Amendment protection. Indecent art wasn't being funded and the, and the Supreme Court said that's okay. Well the Supreme Court said the general concept of indecency, uh, requiring that the commission consider general standards of decency was okay because it was such, that was so broad and they weren't required to do one thing or the other based on this. And they, but the court said if the provision had introduced viewpoint discrimination, particular viewpoint discrimination, then it would have been a different story. So that's why we think that the adding this negative of Texas or Texans changes it very differently. The court in Finley said, uh, the considerations that the provision introduces by their nature do not engender the kind of directed viewpoint discrimination that would prompt this court to invalidate a statute on its face. Said the provision does not introduce considerations that in practice would effectively preclude or punish the expression of particular views. That's what this is doing in practice. I know. Cause you made the film. It didn't effectively preclude or punish. The film was made in Texas with all the view of Austin that we could live with. And so it wasn't precluded. Well, but then that argument would have defeated the son of Sam cases where the people said, well, the book got made anyway, where all we're saying is you don't keep to keep your proceeds. That's the same situation here. The film did get made, but we had to spend more of our, spend more of our own money when we were entitled to public funding to do so. No, you just didn't get Texas to pay you to make a movie that you made and made money on, I assume. Yes, but we didn't, we didn't get that because of the expressed nature of our film because of the particular message we conveyed. We were, we were compelled to spend more of our resources to make this film than we would have otherwise been compelled to spend had the statute not been applied unconstitutionally to us. There's a number of procedural questions in this case we haven't got to, and the district court said that the 11th amendment barred a number of the claims, the claims brought against the officials in their official capacity. The state, to its credit, on appeal, brought up our Benzing case, which says that when a party removes a case to federal court, which the state did here, that 11th amendment immunity is waived. But you've never argued that, certainly didn't argue it below, so is that waiver, did you basically waive that waiver argument by not claiming that removal was a waiver? No, I think we inartfully made the argument that there was a waiver here of that particular argument. We had talked about forum selection and things of that nature. We had not brought it to the court's attention probably as thoroughly as we should have, but I think it's . . . Madam Clerk, would you give Mr. Bandelow two more minutes because we probably need to talk about this a little bit. Thank you, Your Honor. But we think that it was appropriately raised in the pleadings and in the appellate pleadings, so . . . and Benzing, I think, is directly on point that that's a waiver there. We argued other reasons as to why there wasn't 11th amendment issues here, but we think that that can be brought up at any stage and is an appropriate argument. Maybe I gave you too much time. Okay, well, thank you very much, Mr. Bandelow. Thank you. We will hear from Mr. Howell now. May it please the Court. Filmmakers in Texas are free to make whatever films they wish to make just as they are in any other state in the Union. And Texas, just like any other state, cannot stand in the way of that form of expression, but it's also not required to pay for it. Texas has a valid interest in growing its in-state film industry and boosting tourism, and for this reason, Texas can incentivize filmmakers to come . . . I do have a position on that, whether . . . Because this 11th amendment was waived by removal argument was not made. It would have been in headlines with an exclamation point if they had thought of it, but they didn't. So have they waived the waiver? You didn't make that argument, and he didn't make the waiver argument, so . . . No, we didn't make that argument because . . . When we're discussing immunity from suit, it's a jurisdictional matter that goes to the jurisdiction of the court to hear the question. And so, I don't believe necessarily . . . I can't stand here and say that they waived the waiver, because I don't think that's an issue that can be waived. The 11th amendment isn't subject matter jurisdiction, because the 11th amendment immunity can be waived. So I'm not sure it fits within that framework. Well, regardless, we still face this waiver by . . . I mean, I'm certainly happy for the court to decide that it wasn't waived, and we fully briefed the issue. Because . . . But at the end of the day, then we still have to address this applicability of the Benzing case. How did this come up? How would you have . . . I mean, you asserted it below, correct? Yes. The 11th amendment. Yes. There was no response to it. I mean, no negative response. They didn't argue that you were not entitled to the 11th amendment. What did they say in the district court at all? Well, the district court analyzed it, and we pitched it more as their lack of standing, and for their failure to address or allege a prospective or ongoing violation of their constitutional rights. And so, we said, because you haven't alleged an ongoing violation,  But it's really an immunity . . . Yeah, but the way the court analyzed that was prospective relief. The question is, you know, whether you've alleged anything that really we can look at. But the court didn't even reach retrospectively, which is what they're really asking for. They're asking for a declaration that they get money. Didn't even look at that because of the 11th amendment immunity, and nobody really questioned that until your brief on appeal. Right. So, this kind of comes back to the question of whether this Benzing decision . . . I mean, we made this argument in its fulsome argument on immunity to preserve that issue, should we need to, if we don't prevail on the merits here, either in the form of raising a bond . . . What I'm trying to figure out, and it's somewhere in the back of my mind, is you asserted the 11th amendment as an affirmative defense or as some sort of . . . you raised the 11th amendment immunity in the federal district court. Yes. And there was no response, negative response, or opposition to that from the plaintiff. Is that correct? That's my understanding. They challenged our allegations, but yes. But, why . . . and then you waived it. Then you were on appeal. You did continue to waive 11th amendment . . . I mean, argue 11th amendment immunity. Now, at what point would you have waived his waiver? I'm trying to figure that out. I mean, when did you have an opportunity? When would you have asserted that he . . . How would he assert that you waived his waiver? I mean, I'm trying to figure that out. This is tricky, right? Because now we're at a waiver of a waiver of a waiver, but . . . When were you obligated to . . . when were you obligated to reassert it? When were we obligated to . . . Assert the 11th amendment? Well, we did so . . . He never objected to it. You asserted it as a defense, and it's still there. I mean, I don't see that you waived a waiver. I'm trying to figure it out. No, I mean, we made the argument in our appellant's brief. In this court, there's really no other way for us to assert that. And so, that's our . . . section one of our brief is that entire discussion. But, the first waiver is your removal. So, you're the first waiver. The first waiver of immunity is your removing the case. Then, their waiver is not raising the removal as a waiver. And then, the third waiver is you're not raising their waiver of your waiver. So, that's where you're at right now. And that's why this is so complicated. Let me ask you this. If we just threw all that aside, do you still win on the merits? Yes. Okay. Why don't you talk to us about that? I would like to start on that aspect with the Finley case. Because, as my friend in opposition said, this is, as they portrayed it, the seminal case on the idea that subsidies might, in theory, violate the First Amendment. And, all of that comes from a single paragraph at the end of section 2A of that opinion, in which the court observes in dicta that subsidies cannot be used to suppress dangerous ideas, citing a case called Regan, and that it cannot be used to coerce speech. I would note at the outset that no court has ever pointed to the Finley opinion to strike down a subsidy like the one at issue here. But, the key distinction is when we pick apart that paragraph and look at the authorities that are cited there, it cites Regan, it cites a case called Arkansas Writers Project, Minneapolis Star, Simon & Schuster, which is a Son of Sam cases. All of these cases deal with taxes, and that's a key distinction from what we have here, which is a discretionary subsidy. In these tax cases, so the Regan case actually upheld a subsidy, but it itself cited a case called Spicer from California, dealing with a tax exemption in which the individual, in order for someone to be eligible for this tax exemption, it was in the 1950s in the height of the Red Scare, you had to give basically an oath of loyalty and say, I promise not to advocate for the overthrow of the United States government. And if you made that oath, then you were eligible for this tax exemption. And the Supreme Court said, no, that basically is an unconstitutional condition on one's First Amendment right to free speech. And what you have there is basically a binary decision, either conform or pay up. That's very different from what we have here, and what we have, for example, in the Rust case, where people's speech is, to the extent it's limited at all, is only limited within the operation of the program itself. And so to contrast this sort of binary conform or pay up situation that you have in Spicer and Arkansas Writers Project, for example, with the situation you have in Rust, programs who wanted to get this funding for the family planning project could obtain that funding as long as they didn't advocate for abortions through the operation of the program. The court observed that's okay as long as that program does not restrict your speech outside of the program. Ours is on all fours of that situation, and if anything, it's less restrictive than what we had in Rust, because the question of a project being denied for having inappropriate content, or content that portrays Texas in a negative light, those are just factors. The statute says the commission may deny projects for that reason. And so it's entirely discretionary. To the extent it applies at all, it only applies whenever you're operating within the program. It certainly doesn't stop any filmmaker from making whatever film they want to in Texas. And so because it doesn't restrict speech outside of the program, it doesn't affect their rights. I would also note that it might be different if this were a tax like Spicer, where you're only eligible for the tax exemption if you're making a film in Texas, if you conform your speech to this anti-Texan limitation. But that's not what we have here. Any application that's submitted may or may not be granted, regardless of its content. And really what the Rust... There's no limit on the viewpoint discrimination that you think the state can engage in with this program. Let's say someone was making a Lyndon Johnson biopic, and because Texas is now, all the elected officials are Republicans, they say, oh, we don't want a nice movie about a Democrat, and we're not going to give money, even though it's all going to be filmed in Texas. Would that be permissible? Yes. The short answer is yes. But it's important to consider the two allegations they have. And I think it was Judge Haynes, or Judge Jolly, who raised the question of, is this the as-applied or the facial challenge? For all the reasons I just discussed, it's facially valid. But in a case like this, now we're getting into their as-applied challenge. Because they say, hey, our political... We were discriminated against because of our viewpoint. And so this Lyndon Johnson biopic would be a similar thing. Even if it's facially valid, can you deny an application for this reason? And so the answer is yes, and the reason is, is because Rust and Finley both say that these sorts of decisions are content-based, and they're inherently content-based, and that you can discriminate on the purpose of viewpoint, as long as you're not restricting people's speech outside of the program. But wouldn't that be untethered to the stated reason about tourism? In other words, would it be irrational to say a positive film about Lyndon B. Johnson is going to deter tourism to Texas? I... Not necessarily. But you raise an important point here, which is that it is subject to rational basis review. But... So you do look to the purpose, right? Does this promote tourism, or does it drive the film industry in Texas? Does this project present or create jobs in Texas? And so there could be a connection, a hypothetical connection, in which the commission could say, we don't think that this is going to further those purposes for one reason or another, as long as they can explain why. But what I'm saying is, if it is irrational, though, then it would be struck down, because it doesn't have a rational basis, right? Sort of like the caskets. They had a good purpose, making sure caskets were appropriate, but they went about it in such a way that it bore no relationship to that good purpose. So the good purpose of promoting tourism in Texas is fabulous, but this thing with Lyndon Johnson, portraying him positively, and the whole movie is about what a great guy he is and all about his Texas roots, you can't really make a rational connection between that and saying that's going to discourage tourism. Right. Okay. So it's important, then, to keep in mind that we're addressing now the as-applied challenge as opposed to the facial challenge. Certainly, in the as-applied context, there probably are applications of the statute that could be irrational. But in this application, what we have is a decision that the movie does not portray. We don't know exactly what the portrayal... I mean, we know what they allege, which is unpopular political viewpoints. But at the end of the day, the question is, is that decision rationally related to the decision not to... I haven't seen this movie. What's so terrible about it? Everybody's talking in code, and I'm sort of missing the code. What's the bad thing about this movie? Because I haven't seen it, and I really don't want to have to go watch it to understand the case. So can you explain it to me? Well, let me qualify all of this by saying that it's not a part of the record. The script isn't a part of the record. Not that it makes a difference one way or the other to the court's decision here. The idol is part of the record. Certainly, yes. There is some of that, because I have seen both Machete and Machete Kills. And the allegation, I think, is that, as Mr. Bandlow alluded to, there are portrayals more in Machete than Machete Kills about the United States' immigration policy. And it culminates in this battle at the end of the Machete movie portraying, if I remember correctly, a group of militia, and I don't remember if it was Texas specific, but there's a group of militia battling a group of, and Mr. Bandlow can certainly correct me on this, but a group of illegal immigrants. Machetes are involved. But at the end of the day, so what they say is... Right. But at the end of the day, that's what we're dealing with. Is a movie that portrays Texas in this fashion, does that further our interest in boosting the film industry or portraying Texas in a positive light? Nobody was arrested. Nobody was arrested. They just treated it as normal Texas conduct. That comes back to the discretion. Another point about this is that the commission, the statute is clear that the commission doesn't have to act on these applications at all. Any application can just be stuck in a drawer. And so whether you conform your speech or not, you're not guaranteed a denial or a grant of the application. And so that's yet another reason why this is not facially invalid. And here, when you have a film that, as they admit, perhaps can be seen as portraying Texas in a negative light, that it would be denied because it's not consistent with the purpose. I would also note... If you were going to make an as-applied challenge, wouldn't we have to know more about the movie than we know now? How did that not get into the record? Did anybody ever suggest that we should know what the content is in order to make an as-applied challenge? No. But it's not necessary here because in this case, their allegation,  they're saying our application was denied because of an unpopular political... Perceived as. Perceived as being antithetical to this purpose. Well, the court doesn't have to weigh whether or not it supports it or not. The bigger question is, can we impose that factor when we evaluate these? So the facial and as-applied challenges are pretty bound up here because ultimately we can discriminate on the basis of viewpoint if it... What about his discovery argument? That's what he led with and we haven't really talked that much about it. Obviously he doesn't need discovery from you to show what the movie shows. So that isn't the aspect of it. But are there facts here that might make a difference that they were prevented from discovering? No. To go back to what I was just saying, there's really nothing... Because we have this discretion and because the purpose is... Because our denying an application that portrays Texas in a negative light is rationally related to the purposes that are articulated here, it doesn't matter. What if the members of the agency were secretly recorded saying that they were denying the funds because they didn't like the race of the person making it? Would that make this any different of a case? Your answer to that... You know what your answer to that is? Yes. That's not this case. Well, it's not perhaps a First Amendment case. It may not be a First Amendment case. So are there boundaries then to this discretion? That being one of them. Certainly. The state is not in a position to discriminate against protected classes, but they don't raise an equal protection claim. Their claim is entirely based on the First Amendment and then this due process claim about vagueness. So there are boundaries, but you're saying this decision was made within those. Yes. Rational basis would be a boundary. Not discriminating based on race would be a boundary. Not preventing them from making the movie entirely would be a boundary. Yes. And so they say, hey, the reason why ours is special, why our case is special, is because we are asserting a political view. And discrimination on this articulated political view is wrong. But that's not the distinction that the court looks to. Two examples I would give actually both come from Rust. So the Rust case involved restrictions on abortion speech. Obviously that's a highly political issue. And yet the court said as long as we're not stopping people from speaking outside the context of the program, it's okay. And the other example is the National Endowment for Democracy example that the court cited in Rust. In which the court said look, if the government decides we're going to fund something called the National Endowment for Democracy, the government is not also obligated then to create the National Endowment for Communism or the National Endowment for Fascism. There's a permissible governmental purpose at play here and as long as its application of it is rationally related to that, then it's not required to fund every alternative viewpoint. And so that's why this allegation that our reason for denial is political and therefore we're different actually doesn't save their claim. And no amount of amending the pleading or discovery would further that. If the court has... Thank you. Thank you, Your Honor. Just a point of clarification. The court had asked what we had alleged. We specifically did allege that we were told by Commissioner Morales that the funding would not come because of the perceived political nature and content of Machete. Machete, as Robert Rodriguez said, was a maxploitation film. It was simply a sort of a hero character, a former federally in Mexico, moves to Texas, gets set up to look like he committed a crime that he didn't and then he exacts revenge on the bad guy. So it's a kind of standard fare in that regard. There is a senator played by Robert De Niro who is a Texas senator who probably does not look as bright as one would hope someone would look but there are also very many wonderful, sweet Texas people who do lots of wonderful things in the film. The one thing that's very important to me is he said that there's this little obscure reference in the Finley case that we're relying on and that's just simply not true at all. The Finley case is rife with references to this cannot-be viewpoint discrimination. They mention it over and over and over again. What cases can you cite, doesn't have to be from our court, that have applied Finley, that language you're relying on, to strike down a subsidy program similar to this one? Actually, there is one. The U.S. Supreme Court, I think in an analogous situation in the Rosenberg v. Rector case, which is referenced in Finley, that's 515 U.S. 919, the Rosenberg v. Rector case involved funding by the University of Virginia for particular newspapers and there was a restriction in there that said they wouldn't fund certain religious newspapers, etc., and the Supreme Court struck that down. So the Supreme Court said once you get in the business of funding, you can't deny funding based on viewpoint discrimination. So it has happened. But as I said, in Finley, they pointed out how when Congress was revising this statute, they specifically declined to disallow any particular viewpoints. The court was very moved by that fact. They talk about we have no occasion here to address an as-applied challenge in a situation where the denial of a grant may be shown to be the product of invidious viewpoint discrimination. If the NEA were to leverage its power to award subsidies on the basis of subjective criteria into a penalty on disfavored viewpoints, then we would confront a different case. And that is the case we are confronting. We have a statute that specifically sets forth a particular viewpoint that it will not allow and that it will punish by depriving them of funding. Now I understand we were able to make our film, but we were able to make our film at a disadvantage that other people did not suffer simply by virtue of the viewpoints expressed in our film. Have you ever thought about the fact that if you were successful in this case, you were going to cut out funding for everybody? No, not at all. Yeah, they can just end the program. Well, that's certainly their choice, but it is sort of a... Well, no, I don't think so, because I think if we win the case, we simply strike that provision that allows them to withhold funding based on a negative portrayal of Texas. Can we do that? Can we just pick and choose what we three federal judges think Texas should do? Or do we say it stands or falls on the whole program because this is the program Texas put in place and if it's unconstitutional, you've got to strike the whole program? I don't think that we're saying that the whole program is unconstitutional. You're not, but you're picking and choosing what you like and don't like, and we as federal courts typically don't like getting enmeshed in what the legislature likes and doesn't like to do. And so if they pass a statute that's unconstitutional, in part, is there a severability provision? I'm not aware that there is, but I think... All right, well, then they've spoken on that, because when they want us to be able to pick and choose, they put a severability in when they know we might strike down part, but they want to keep the whole thing. But here, they may want to keep either it rise or fall. And if they can't discriminate, as you say, on promoting or not promoting tourism, then throw it out. I think there would not be an issue whatsoever with the court invalidating that one provision of the statute and leaving the film commission in place. I think that happens frequently. I think when the Supreme Court struck portions of the CDA, they only struck the portions relating to child pornography. They left in the Internet immunity provisions. I think that happens all the time, that a federal court can strike certain provisions because they're being applied in an unconstitutional manner or on their face are unconstitutional. Even then, practically, as Judge Jolly was suggesting, the state legislature's not going to, in all likelihood, fund another dollar to this program. I don't think that's the case at all. I think the state legislature has an incredibly big inspiration to fund these films. It's bringing a ton of money and tax revenue and employment to the state of Texas. I think that was the purpose of the statute. I think there's no chance in the world that they'd get rid of this statute. But if they're going to get in the business of providing funding, they can't say, well, we're providing funding, but if your film is positive to gay marriage, we can deny funding. I think the court would have no problem with that. We have your argument. We appreciate it very much. Thank you very much, Ron.